## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MAINE

|  |  |
|---|---|
| In re:<br><br>Scott L. Fenstermaker<br><br>Debtor | Chapter 7<br>Case No. 24-10108 |
| Martha Czymmek<br><br>Plaintiff<br><br>v.<br><br>Scott L. Fenstermaker<br><br>Defendant | Adversary Proceeding<br>No. 24-01004 |

## <u>MEMORANDUM OF DECISION</u>

Disinherited by his father, Scott L. Fenstermaker took to the courts, suing his sister Martha Czymmek (and others).    An Ivy League-educated, longtime New York lawyer, Fenstermaker represented himself.    His efforts in federal and then state court in Connecticut failed.    Yet, Fenstermaker persisted.    And Czymmek incurred mounting legal fees and costs. Eventually, Fenstermaker was ordered to pay some of those fees and costs when a Connecticut state court sanctioned him for his unwarranted perseverance.    When Czymmek took initial steps to collect that debt from Fenstermaker in New York and Maine, she was met with more of his legal wrangling.    He was again, and again, sanctioned.    Owing Czymmek more than $114,000, along with other financial woes, Fenstermaker filed a voluntary bankruptcy petition here. Czymmek then began this adversary proceeding.

In a three-count complaint (one count for each sanction award), Czymmek says that Fenstermaker's discharge in bankruptcy does not eliminate the debts owed to her because they

1

are for willful and malicious injuries.    *See* 11 U.S.C. § 523(a)(6).    She says that findings in court decisions establishing those debts prove it and preclude further consideration of the matter. Unsurprisingly, Fenstermaker disagrees.

The parties were, however, able to agree that their arguments could be tested most efficiently through summary judgment procedures without engaging in discovery first.    As expected, Czymmek then filed a motion for summary judgment, along with a statement of material facts and supporting exhibits.    Fenstermaker, continuing to represent himself, responded in opposition.    He included a personal declaration and supporting exhibits, but he did not address Czymmek's statement of material facts.    Thus, for summary judgment purposes, Fenstermaker is deemed to have admitted those facts.    *See* Fed. R. Civ. P. 56(e)(2); Fed. R. Bankr. P. 7056; D. Me. LR 56(c), (f); D. Me. LBR 7056-1; *see also* Order Est. Summ. J. Proc. [Dkt. No. 14].

After reviewing the parties' submissions, the Court determined that oral argument would not aid its deliberative process.    In reaching its decision set forth below, the Court has considered all materials cited by the parties and all other materials in the record.    *See* Fed. R. Civ. P. 56(c)(3).[1]    Having done so, in accordance with the summary judgment standard also set forth below, the Court concludes that the debts owed by Fenstermaker to Czymmek are excepted from discharge under section 523(a)(6).

---

[1] Specifically, that record includes: Czymmek's Complaint [Dkt. No. 1]; Fenstermaker's Answer with Exhibits A-H [Dkt. No. 8]; Czymmek's Motion for Summary Judgment [Dkt. No. 18]; Czymmek's Supporting Statement of Material Facts with Czymmek's Affidavit as Exhibit A and Exhibits 1-5 to that affidavit [Dkt. No. 19]; and Fenstermaker's Response and Declaration with Exhibits A-G [Dkt. Nos. 21 and 23].    The exhibits attached to Czymmek's Affidavit are the court decisions and orders upon which Czymmek relies for material facts here.    Although not disputing the accuracy of the text, Fenstermaker objects that Czymmek has relied on copies that are not certified.    That objection is overruled below.

## I. <u>Facts</u>

The following undisputed facts are drawn from the record.    Certain facts may not be material but are nevertheless included to provide useful context for understanding the parties' dispute.

In 1997, the parties' father executed a will that provided equally for his children, who by then were adults.    In 2016, he revoked that will and executed a new will, expressly excluding Fenstermaker.    To challenge this presumptive disinheritance, Fenstermaker sued his father, Czymmek, and a bank in federal court in Connecticut.    Fenstermaker represented himself (as he continued to do in later proceedings).    His lawsuit foundered largely because his father was still alive, and thus, any potential injury to Fenstermaker remained hypothetical.    *See* Ans. Ex. B (<u>Fenstermaker v. PNC Bank</u>, No. 3:17-cv-00778-JAM (D. Conn. Mar. 26, 2018) (disposing of and directing closing of case)).    A few months later, in June 2018, his father died. Fenstermaker, however, took no further legal action on the inheritance matter for more than a year.

Meanwhile, within about two weeks of their father's death, Czymmek sought in Connecticut state court—specifically, in Probate Court—to settle his estate, based on the 2016 will.[2]    The Probate Court approved the estate settlement two months later in an August 2018 final order.    Exactly when Fenstermaker learned about that proceeding and the order is unclear, but he knew before he began his own proceeding in Probate Court, discussed below.

---

[2]  Their father executed more than one will in 2016.    For convenience, this decision uses "the 2016 will" and similar phrasing to refer to the last 2016 will, which was the subject of the proceedings in Connecticut federal and state court.

*Connecticut State Court Sanction*

In July 2019—nearly a year after the final order settling the estate based on the 2016 will—Fenstermaker applied in Connecticut Probate Court to have his father's 1997 will probated.    This is when Fenstermaker's later-sanctioned conduct began.    This is also around when, in responding to that application, Czymmek began incurring her later-awarded legal fees. Within a few months, after a hearing, Fenstermaker's application was denied.

Fenstermaker attempted to appeal by filing a complaint in Connecticut Superior Court in December 2019.    Czymmek was a "defendant/appellee" and took an active role, continuing to incur legal fees.[3]    Concluding that it lacked subject matter jurisdiction and statutory authority, the Superior Court dismissed the appeal.[4]    The Connecticut Appellate Court summarily affirmed the dismissal.    The Connecticut Supreme Court and then the United States Supreme Court both denied Fenstermaker's requests for further review.    Along the way, Czymmek filed four motions in the Superior Court action requesting that Fenstermaker be ordered to pay her legal fees and costs.    Collectively, the requests covered August 2019 through January 2023— that is, the entire period of negating Fenstermaker's effort to revive the 1997 will, as well as time spent to request the fees.

---

[3]  The parties' brother was also a "defendant/appellee" but took no apparent active role in this or later related matters.

[4]  Fenstermaker included a copy of that February 25, 2021 decision with his Answer (Ex. H) and a certified copy with his opposition to summary judgment (Ex. B).    In the decision, the Superior Court (D'Andrea, J.) rehashed the parties' arguments at length, formulated six possible scenarios in which the court might have jurisdiction over Fenstermaker's claims, and then meticulously rejected all six.    The rejected scenarios involved issues of statutory timing and notice requirements, as well as claims Fenstermaker had purported to raise by filing his application to probate the 1997 will.    Ultimately, the Superior Court concluded that the application had been a procedurally impermissible direct attack on the Probate Court's 2018 final order.

The Superior Court addressed all four motions together.   Fenstermaker opposed the motions, and the Superior Court held a hearing before granting the motions and awarding Czymmek her legal fees and costs.   When making the award, the Superior Court acknowledged and to some extent incorporated prior final determinations in its decision.[5]   The Superior Court also made factual findings based on its entire casefile.

To conclude that Fenstermaker had asserted claims without a colorable basis and had acted in bad faith, the Superior Court relied on facts as to Fenstermaker's knowledge and conduct before he applied to probate the 1997 will, as well as before and throughout his attempts to appeal the denial of that application.   As to Fenstermaker's general knowledge, the Superior Court noted his background as a Harvard Law School graduate and seasoned New York attorney, including years as a Manhattan prosecutor.   The Superior Court's more specific observations about his relevant knowledge and conduct are discussed below.

The Superior Court relayed that, before his father died in June 2018, Fenstermaker would have known about the following relevant circumstances.   Fenstermaker received communications from his father's lawyer about life insurance policies in April 2016. Fenstermaker responded by emailing his father directly, on two successive days, telling his father to stop contacting him—permanently.   Undeterred, his father mailed him a birthday card a few days later.   In July 2016, Fenstermaker returned the unopened card.   On an outer envelope, he substituted an expletive for part of his father's name.   Around this time, an article in New York

---

[5] Czymmek and Fenstermaker each included copies of the Superior Court's May 15, 2023 award decision with their summary judgment submissions.   Fenstermaker's copy was certified.   Among the prior final determinations referenced and incorporated into that May 15, 2023 decision (Shaban, J.) was the February 25, 2021 decision (D'Andrea, J.), *see supra* note 4.   Although the May 15, 2023 decision may contain some inconsistencies when describing the February 25, 2021 decision, any such inconsistencies are immaterial.

Daily News featured Fenstermaker's representation of alleged terrorists and Fenstermaker's perspective on the 9/11 terrorist attacks.    In January 2017, Fenstermaker received written notice that his father had executed a new will in November 2016.

The Superior Court recounted that when Fenstermaker sought to invalidate that 2016 will—in federal court in Connecticut, while his father was still alive—more information about the will's underpinnings became available to Fenstermaker.    The Superior Court described three affidavits (each dated August 1, 2017) that his father filed to support the will's validity: one from the father's physician, one from the father's estate planning attorney, and one from the father himself.[6]    The physician confirmed that the father had the capacity to make financial, legal, and medical decisions.    She also reported that the father had last been evaluated less than two weeks before and was living independently at age 85.    The estate planning attorney reported that the father, while showing no sign of impairment, had been firmly set on disinheriting Fenstermaker—whom the father depicted as confrontational.    In his own affidavit, the father cited incidents of Fenstermaker's disrespect, including the two emails and the return of the birthday card (the latter having resurrected "particularly painful memories" from a Thanksgiving 2009 rift involving Fenstermaker cursing at his father).    The father also noted Fenstermaker's undertakings and viewpoints as reflected in the New York Daily News article, with the father spotlighting one Fenstermaker quote in particular: "'9/11 was deserved . . . [and] one of the greatest events in human history.'"    *See* Czymmek Aff. Ex. 1 (hereinafter "CT Sanction Decision") at 12 & n.12.    The father denied that Czymmek had influenced the disinheritance,

---

[6] Fenstermaker attached copies of the latter two affidavits as Exhibits D and C, respectively, to his Answer in this adversary proceeding.

further noting that her share had not increased as a result.[7]   The father also expressed concern
that Fenstermaker's goal in federal court was to reduce the assets that the father could convey
upon his death by causing him to incur legal fees.

The Superior Court also concluded that, from the federal court case (at least),
Fenstermaker also knew about his father's 1997 will (and codicils), the 2016 revocation, and the
2016 will.[8]   The Superior Court also noted that, before applying to probate the 1997 will—
although the precise timing was unclear—Fenstermaker learned that his father had died and
knew that the Probate Court had entered a final order in August 2018 approving the estate
settlement based on the 2016 will.[9]

The Superior Court observed that Fenstermaker's education and experience in law and
procedure vastly exceeded that of the typical self-represented party.   The Superior Court also
observed that, notwithstanding this sophistication and knowledge of the relevant circumstances,
as discussed above, Fenstermaker nevertheless applied to have the 1997 will probated.   More
precisely, as conveyed by the Superior Court, Fenstermaker did this as an experienced lawyer
with knowledge of decisive evidence showing that the 1997 will (and codicils) had been validly
revoked and showing that the 2016 will had been validly executed.   From the combined facts,

---

[7]  According to the copy of the affidavit attached as Exhibit C to Fenstermaker's Answer in this adversary
proceeding, the father replaced Fenstermaker with Fenstermaker's estranged wife.

[8]  That knowledge included the other wills, also expressly excluding Fenstermaker, that the father
executed in 2016 before the last one.   *See supra* note 2.

[9]  Fenstermaker's own arguments enabled the Superior Court to reach that conclusion.   The Superior
Court noted in its February 25, 2021 decision (*see supra* note 4) that, in 2019, Fenstermaker had applied
to probate the 1997 will in Probate Court without referencing the Probate Court's 2018 proceedings.
Nevertheless, after his application was denied and Fenstermaker began the proceeding in Superior Court,
he argued (unsuccessfully) that his application in Probate Court had been intended as a challenge to that
court's 2018 final order.   Thus, through his assertions to the Superior Court about his intentions,
Fenstermaker admitted that he knew about the Probate Court's 2018 final order before applying to
probate the 1997 will.

the Superior Court inferred that, when Fenstermaker applied to probate the 1997 will, he knew that he had no reasonable basis to do so.   The Superior Court added that, after Fenstermaker's application was inevitably denied, he chose to pursue multiple levels of appellate review while still knowing that he had no reasonable basis for the application.

The Superior Court refuted Fenstermaker's argument that the court lacked authority to sanction him and rejected Fenstermaker's arguments about why his conduct was not sanctionable.   That Fenstermaker had chosen to engage relentlessly in such an unfounded pursuit led the Superior Court to infer "that his purpose . . . was to harass [Czymmek] and to cause her to incur expense in defending against [his] allegations."   CT Sanction Decision at 15. As a result of his bad-faith conduct, the Superior Court ordered Fenstermaker to pay Czymmek's full legal fees and costs, totaling $93,775.77.

Fenstermaker appealed the sanction.   In June 2023, the Connecticut Appellate Court dismissed the appeal because Fenstermaker had not complied with appellate procedure (e.g., to designate items for inclusion in the appellate record).   A few weeks later, Czymmek began the process of attempting to collect the debt from Fenstermaker in New York and Maine.   As discussed below, Fenstermaker fought those efforts.   He also sought and, in November 2023, was denied reconsideration of the dismissal of his appeal of the sanction.

*New York Federal Court Sanction*

In August 2023, Czymmek filed the Connecticut Superior Court's sanction award as a foreign judgment in New York state court, beginning a case under the Uniform Enforcement of Foreign Judgments Act.   *See* N.Y. Civ. Prac. Law & R. §§ 5401-5408.   In response, once again representing himself, Fenstermaker removed the case to federal court in New York. There, he sought to enjoin Czymmek from ever collecting the debt, asserting that he would

otherwise be irrevocably harmed financially by an unavoidable bankruptcy.    He argued that the

Connecticut Superior Court had lacked authority to sanction him and that the sanction had been

unreasonable.    He also argued that, by disposing of his appeal of the sanction award without a

hearing, the Connecticut Appellate Court had failed to provide due process.    Czymmek asked

that the case either be remanded to state court or dismissed—because the federal court lacked

subject matter jurisdiction—and that Fenstermaker be ordered to pay her legal fees and costs for

an improper diversion into federal court.    Fenstermaker did not respond to Czymmek's request

for fees and costs.

The federal court determined that Fenstermaker, as a lawyer, knew that removal was

improper but did it anyway.    First, the federal court recognized that Fenstermaker was asking it

to overrule the Connecticut state court but that such an act is limited to that state's appellate

courts and beyond that to the United States Supreme Court, with no role for other federal courts.

That is, the federal court had no jurisdiction to overrule the Connecticut state court.    The federal

court also indicated that Fenstermaker was aware that he had used his chance to argue and to

appeal matters in Connecticut state court and, having been unsuccessful, frivolously sought to

recycle his state-court arguments in federal court as his bases for removal.

Second, the federal court observed that the case was a classic example of a type that

cannot be removed to federal court.    As the federal court explained, longstanding caselaw had

established that a supplemental proceeding merely to collect a judgment debt—such as precisely

the enforcement proceeding that Czymmek had begun in New York state court—was not a "civil

action" as is required, under 28 U.S.C. § 1446, to be eligible for removal to federal court.

Thus, in January 2024, the federal court remanded the case to New York state court.

And, because Fenstermaker had had no reasonable basis for removing the case from state court,

the federal court inferred that Fenstermaker's only purpose there was to cause Czymmek to incur further expenses while having to wait longer to collect any money from him.    Accordingly, the federal court ordered Fenstermaker, under 28 U.S.C. § 1447(c), to pay Czymmek's legal fees and costs for the unnecessary removal proceedings.    The federal court noted that not all erroneous removals are sanctionable in this way but that frivolous ones such as Fenstermaker's are— because removals that are intended only to increase the other party's costs and to protract litigation are to be deterred.    The sanction totaled $13,685.00 plus post-judgment statutory interest.

*Maine State Court Sanction*

At about the same time she began the enforcement proceeding in New York, Czymmek also filed the Connecticut Superior Court's sanction award as a foreign judgment in Maine state court under the Uniform Enforcement of Foreign Judgments Act.    *See* Me. Rev. Stat. Ann. tit. 14, §§ 8001-8008.    As in the other related matters, Fenstermaker represented himself.    He objected to the enforcement proceeding, arguing that the Connecticut Superior Court had lacked authority to sanction him.    He also argued that the sanction was an excessive fine and cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution. Further, he argued that the enforcement proceeding should be stayed—first, while he awaited the Connecticut Appellate Court's reconsideration of its dismissal of his appeal, and then, while he awaited the New York federal court's ruling in the enforcement proceeding that he had removed from New York state court.    About six months into the enforcement proceeding in Maine, Czymmek asked that Fenstermaker be ordered to pay her legal fees and costs there, and Fenstermaker opposed that request.

The Maine state court underscored that Fenstermaker was a lawyer, noting that he had been licensed (but suspended) in Maine.    The court inferred that Fenstermaker was aware of his obligations to refrain from knowingly making insupportable arguments and needlessly delaying litigation.    Yet, according to the Maine state court, Fenstermaker did both when he lacked plausible support for his objections to the enforcement proceeding but made and advanced them anyway.

The Maine state court noted that reasons to delay an enforcement proceeding are limited by statute.    In general, Fenstermaker needed to show that he had an appeal pending or a stay granted in Connecticut state court or that he had grounds for a stay in Maine state court.

The Maine state court emphasized that the Connecticut sanction award was and had been final (i.e., there had been no appeal pending and no stay there).    Indicating that Fenstermaker knew of this circumstance, the court inferred that his requests to stay the enforcement proceeding were solely delay tactics.    The court also concluded that Fenstermaker had no supporting authority for his argument that the Eighth Amendment was implicated in the enforcement proceeding, and it further concluded that the Eighth Amendment was not so implicated.    Given Fenstermaker's utter inability to support his objections to the enforcement proceeding, the Maine state court inferred that he did not make his arguments in good faith, that he deliberately disregarded his obligations as a lawyer, and that his only purpose was to delay an assured result—namely, Czymmek being able to proceed with collecting the debt from Fenstermaker in Maine.[10]

---

[10]  The court also noted that Fenstermaker had attempted to add more delay by baselessly asking the judge to recuse from the matter.

The Maine state court thus declared that the Connecticut sanction award was entitled to full faith and credit in Maine and would be treated accordingly.    As a sanction, the Maine state court ordered Fenstermaker to pay Czymmek's legal fees and costs in the enforcement proceeding, which totaled $7,017.18.

As noted, the sanction awards together total more than $114,000.    Fenstermaker has not paid anything toward that amount.

## II.    Summary Judgment Standard

If Czymmek has "show[n] that there is no genuine dispute as to any material fact and [she] is entitled to judgment as a matter of law," the Court generally must grant summary judgment in her favor.    *See* Fed. R. Civ. P. 56(a), (c)(1)(A); *see also* Fed. R. Bankr. P. 7056. To avoid that outcome and instead proceed to trial, Fenstermaker would need to establish that at least one specific material fact is genuinely disputed.    *See* Fed. R. Civ. P. 56(c)(1)-(2); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986); Razzaboni v. Schifano (In re Schifano), 378 F.3d 60, 66 (1st Cir. 2004); *see also* Fed. R. Civ. P. 56 advisory committee's notes to 1987, 2007, 2009, 2010 amendments (expressing variously that amendments, although rearranging and rephrasing concepts, have left the summary judgment standard substantively unaltered).

As indicated above, in determining whether Czymmek has prevailed, the Court has considered the particular content in the record that Czymmek and Fenstermaker have cited but has also considered other content in the record.    *See* Fed. R. Civ. P. 56(c)(1), (c)(3).    The Court has viewed the facts that are supported by such content in the light most favorable to Fenstermaker, and drawn only reasonable inferences from those facts, again in the light most favorable to him.    *See* Scott v. Harris, 550 U.S. 372, 378-79 (2007).

As discussed below, Czymmek has met her burden.    And Fenstermaker has not

responded in kind.    Rather, he has presented factual disputes that are irrelevant to the matter at

hand or unsupported by the record (or both), focusing predominantly on his doubts about the

propriety of the circumstances that led to this nondischargeability action—but failing to show

any genuine dispute of material fact for trial here.    *See* In re Schifano, 378 F.3d at 66 ("The

non-moving party must show more than conclusory allegations, improbable inferences or

unsupported speculation to establish genuine issues of material fact.    Competent evidence is

required.").

Before moving on, the Court briefly addresses Fenstermaker's objection to Czymmek's

reliance on copies of the sanctioning courts' decisions and orders in seeking summary judgment

here.    Fenstermaker contends that Czymmek was required to but did not submit those

documents in a form that would be admissible at trial—such as certified copies.    Yet he offers

no reason to question the accuracy of Czymmek's copies.    One of Fenstermaker's own exhibits

in opposing summary judgment is a certified copy of the Connecticut Superior Court's sanction

award decision, and Fenstermaker's copy shows no apparent meaningful difference when

compared with Czymmek's copy.    Nevertheless, Fenstermaker maintains that Czymmek cannot

rely on her copy for summary judgment.

Fenstermaker's argument about admissibility misses the mark.    Admissibility would be

problematic for Czymmek only if the decisions and orders "cannot be presented in a form that

would be admissible in evidence" at trial.    *See* Fed. R. Civ. P. 56(c)(2) & advisory committee's

note to 2010 amendment; Rahim ex rel. Estate of Rahim v. Doe, 51 F.4th 402, 412 (1st Cir.

2022) (observing that, at summary judgment stage, "'standard is not whether the evidence . . .

would be admissible at trial—it is whether it *could* be presented at trial in an admissible form'"

(quoting <u>Gannon Int'l, Ltd. v. Blocker</u>, 684 F.3d 785, 793 (8th Cir. 2012))).    Fenstermaker

himself has shown that at least one decision can be presented in an admissible form, and he does

not suggest that the others could not also be.    Although Czymmek had no opportunity to reply

to Fenstermaker's arguments, the Court sees no reason that, if this matter were to proceed to

trial, Czymmek would be unable to present the decisions and orders in an admissible form.    *Cf.*

Fed. R. Civ. P. 56(c)(2) advisory committee's note to 2010 amendment.    Accordingly, and with

no specific concerns having been raised as to the accuracy of the text, the Court sees no basis to

exclude that documentary evidence from consideration at this stage.

## III.    <u>Analysis</u>

As indicated, Czymmek relies heavily on the preclusive effect of the sanction awards to

show that the elements of nondischargeability under section 523(a)(6) have already been met for

each count and thus no trial is needed.    Fenstermaker, on the other hand, seemingly invites or

outright asks this Court to disregard or to revisit the determinations of the sanctioning courts.

Neither of his proposals is appropriate here.

### A.    <u>Issue Preclusion</u>

In federal courts, state court decisions are entitled to the preclusive effect that they would

have in the issuing state.    *See* 28 U.S.C. § 1738; <u>Migra v. Warren City Sch. Dist. Bd. of Educ.</u>,

465 U.S. 75, 80-81 (1984).    Likewise, federal court decisions are entitled to the preclusive

effect that they would have under federal common law.    <u>Kane v. Town of Harpswell (In re</u>

<u>Kane)</u>, 254 F.3d 325, 328 (1st Cir. 2001) (citing <u>Monarch Life Ins. Co. v. Ropes & Gray</u>, 65 F.3d

973, 978 (1st Cir. 1995)); *see also* <u>Taylor v. Sturgell</u>, 553 U.S. 880, 891-92 & n.5 (2008)

(describing preclusion concepts under federal common law).    Preclusion doctrines limit

relitigation and thus promote judicial economy and finality.

In nondischargeability actions such as this one, issue preclusion can apply.    McAlister v. Slosberg (In re Slosberg), 225 B.R. 9, 13 n.3 (Bankr. D. Me. 1998) (explaining why issue but not claim preclusion applies).    That is, a party may be precluded from relitigating issues, including factual issues, previously determined.    Czymmek contends that Fenstermaker is precluded from relitigating issues determined in connection with each sanction award.    The two states here— Connecticut and Maine—and federal common law all have substantially similar principles of issue preclusion, generally corresponding to that concept as described in the Restatement (Second) of Judgments.    *See* Restatement (Second) of Judgments § 27 ("Issue Preclusion— General Rule"); Crochiere v. Bd. of Educ. of Town of Enfield, 630 A.2d 1027, 1034 (Conn. 1993) (applying Restatement (Second) of Judgments § 27 & cmts. d & h in Connecticut); Trikona Advisers Ltd. v. Chugh, 846 F.3d 22, 32 (2d Cir. 2017) (noting that "Connecticut adheres to the rule of [issue preclusion] articulated in . . . Restatement (Second) of Judgments § 27"); In re Kane, 254 F.3d at 328 (noting that, for issue preclusion, "both the federal courts and the Maine courts tend to follow the general approach of the Restatement (Second) of Judgments").[11]    Relevant nuance and exceptions are saved for later discussion as needed.

In general, "an issue [that was] 'actually litigated and determined by a valid and final judgment,' if 'essential' to the judgment," cannot be relitigated in a later action between the same parties.    In re Kane, 254 F.3d at 328 (quoting Restatement (Second) of Judgments § 27). Reordering those concepts for ease of discussion below—issue preclusion applies here if each sanction award qualifies as a valid and final judgment, with the issues that are proposed to be

---

[11]  Even when decisions on issue preclusion under Connecticut state law, federal common law, and Maine state law do not cite § 27 of the Restatement (Second) of Judgments, they commonly echo and endorse the language there.    As an example, compare Cumberland Farms, Inc. v. Town of Groton, 808 A.2d 1107, 1116-17 & n.17 (Conn. 2002), with the Restatement (Second) of Judgments § 27 and comments c, d, e, h, and k there.

precluded from relitigation having been essential to the determination of each sanction award and having been actually litigated.    The criteria are met for each sanction award.

First, each sanction award is a valid and final judgment.    Each one is valid because, among other reasons, each court had jurisdiction over Czymmek's request for sanctions, as detailed below.    *See* Restatement (Second) of Judgments § 27 cmt. k (incorporating § 1, which describes a "valid judgment" and, in turn, incorporates § 11 on subject matter jurisdiction); *see also* Restatement (Second) of Judgments § 11 ("A judgment may properly be rendered against a party only if the court has authority to adjudicate the type of controversy involved in the action.").[12]    The Connecticut and Maine state courts had jurisdiction under the common law, and the New York federal court had jurisdiction under a statute.    Specific authority identified and applied by each court is discussed in more detail later.    Each sanction award is final because none was a provisional determination.    *See* Restatement (Second) of Judgments § 27 cmt. k (incorporating § 13, which provides that "for purposes of issue preclusion . . ., 'final judgment' includes any prior adjudication of an issue in another action that is determined to be

---

[12] Fenstermaker repeatedly insists, without any persuasive support, that when a court lacks subject matter jurisdiction over a claim, that court is categorically prohibited not only from adjudicating the claim but also from assessing whether the claim has merit for purposes of imposing sanctions.    Each sanctioning court rejected this theory (or a version of it).    Fenstermaker's theory cannot be correct because, among other reasons, such a limitation on courts would allow certain vexatious litigants to readily escape any sanction.    That is, under Fenstermaker's theory, one who seeks to harass another via baseless litigation would need only to file his claims strategically in a court that lacks subject matter jurisdiction over such claims, and, because that court could never consider whether the claims had merit, the vexatious litigant could file the same lawsuit ad infinitum without risking financial or other sanctions (such as filing restrictions) for knowingly bringing unfounded claims.

sufficiently firm to be accorded conclusive effect").[13]    Each of the courts that determined to
impose a financial sanction on Fenstermaker has said the last word on the subject of sanctions,
leaving no question that such determinations now deserve a measure of finality here.

Second, the legal and factual issues relating to Fenstermaker's knowledge, conduct, and
purpose when he chose to litigate against Czymmek were essential to each court's decision to
sanction him.    These issues could hardly be characterized as ancillary to the courts' decisions or
superfluous.    In fact, such issues related to the critical questions that had to be answered by the
courts: whether Fenstermaker knowingly brought unmeritorious claims for an unacceptable
purpose, warranting a sanction.    And it is patently obvious that the type of sanction (an award
of legal fees and costs) and the amount of the sanction were essential parts of each court's
determination.    As discussed below, essential issues from the sanction awards overlap neatly
with the issues to be determined in the nondischargeability action here.[14]

Third, the essential issues were actually litigated, including those related to
Fenstermaker's knowledge, conduct, and purpose when he chose to litigate against Czymmek.

---

[13]  The summary judgment record makes clear that the Connecticut sanction award is final, as
Fenstermaker's efforts to undo that award failed procedurally.    The record does not address whether
Fenstermaker sought to undo the sanction awards of the New York federal court or the Maine state court.
Regardless, because the sanction awards were not provisional decisions, any pending efforts to undo them
would not alone affect finality for issue preclusion purposes.    *See* In re Kane, 254 F.3d at 328 (citing
caselaw and Restatement (Second) of Judgments § 13 cmt. f); *see also* Restatement (Second) of
Judgments § 13 cmts. a & g.

[14]  In an argument similar to one described below, Fenstermaker suggests that pleadings and motion
papers from the proceedings that led to the sanction awards are somehow required for this Court to assess
which issues were essential (or necessary) to each sanction award.    Such issues, however, are to be
gleaned here from the sanctioning courts' written decisions—as essential issues are the legal and factual
issues upon which the outcome relies (that is, in a written decision, generally not dicta).    *See*
Restatement (Second) of Judgments § 27 cmts. h & j; *see also, e.g.*, Grella v. Salem Five Cent Sav. Bank,
42 F.3d 26, 30-31 (1st Cir. 1994) (observing that essential issues can "constitute[], logically or
practically, a necessary component of the decision reached in the prior litigation" without being explicitly
identified in the decision).

For each sanction award, the courts recounted factual and legal issues that the parties had raised, showing which issues each court considered and determined in deciding to sanction Fenstermaker.    As the Connecticut and Maine state courts detailed in their decisions, Czymmek requested financial sanctions—supporting her requests with applicable legal arguments and relevant facts about Fenstermaker's knowledge, conduct, and purpose—and Fenstermaker responded in opposition.    The Connecticut state court even held a hearing on the matter, during which "the parties agreed that all the documents and pleadings that make up the court's file in this matter could be considered in the determination of the motion before the court."    CT Sanction Decision at 11.    In New York federal court, although Fenstermaker did not respond to Czymmek's request for sanctions, the record here does not suggest that he lacked a reasonable opportunity to do so or that any response was necessary to provide information pertinent to that court's sanction analysis.

In opposing summary judgment here, Fenstermaker suggests that the written decisions supporting the sanction awards are, alone, insufficient to show which issues were actually litigated—that is, which issues were "properly raised, by the pleadings or otherwise, . . . submitted for determination, and . . . determined," *see* Restatement (Second) of Judgments § 27 cmt. d.    He quotes that standard, correctly noting that it is applicable under Connecticut state law, and he references equivalent standards under federal law and Maine state law.    He then contends that, because Czymmek did not provide copies of the underlying pleadings and motion papers that led to the sanction awards, she cannot show which issues were actually litigated. Fenstermaker does not offer any example of a legal or factual issue that the pleadings or motion papers would show that the written decisions do not, or vice versa.    That is, he offers nothing beyond bare recitations of the "actually litigated" standard to support his contention that, relying

on the written decisions alone, Czymmek cannot show which issues were actually litigated.    To

the extent that Fenstermaker contends that more than a court's decision is always required, he

does not support that contention either.    Nor would such a contention be supportable.

As Fenstermaker notes, because Czymmek is the party invoking issue preclusion, she

bears the burden of showing that it applies.    The written decisions supporting the sanction

awards, however, are sufficiently detailed so as to meet the "actually litigated" component of that

burden here.    Fenstermaker's tactic of merely reciting a standard and simply insisting that more

evidence is required to meet that standard does not show that there is a genuine dispute of any

specific material fact about which issues were actually litigated in the prior proceedings.[15]

In addition to the arguments addressed above, Fenstermaker contends, broadly speaking,

that applying issue preclusion here would be unfair.    He argues that, as to the Connecticut state

court sanction, certain exceptions to the general rule of issue preclusion should apply.    *See*

Def.'s Resp. 17-24; *see also* Cumberland Farms, Inc. v. Town of Groton, 808 A.2d 1107, 1116-

18 (Conn. 2002) (detailing policies and purposes underlying issue preclusion doctrine and factors

to consider when determining whether exceptions should apply); Restatement (Second) of

Judgments § 28 (delineating exceptions to general rule—narrow circumstances in which, despite

issue preclusion criteria having technically been met, relitigation of issue is not precluded).

Fenstermaker does not expressly extend these arguments to the New York federal court sanction

---

[15]  Further, Fenstermaker appears to suggest that pleadings and motion papers are necessary because this
Court would need to compare those items to the written decisions to determine whether the issues are
identical between them.    Such a contention is misguided.    There is a principle of issue preclusion that
requires issues to be identical to an extent.    But that identicalness requirement is one that involves
comparing issues from the prior proceeding with issues in the current one.    *E.g.*, Restatement (Second)
of Judgments § 27 cmt. c; Manganella v. Evanston Ins. Co., 700 F.3d 585, 591 (1st Cir. 2012).    This
comparison is discussed below in connection with detailing the elements of section 523(a)(6) and shows
that the identicalness requirement is met—including because, like the sanctioning courts, this Court must
focus largely on Fenstermaker's knowledge, conduct, and purpose when he litigated against Czymmek.

or to the Maine state court sanction.    As detailed below, the arguments are not persuasive and, to some extent, although cloaked in issue preclusion terms, are impermissible attempts to appeal the Connecticut state court actions in this Court.[16]

Fenstermaker argues repeatedly that, when considering sanctions, the Connecticut Superior Court's consideration of the record—i.e., its entire casefile—was faulty because, among other reasons, development of the record was curtailed.    Fenstermaker suggests that, if discovery in the underlying inheritance-related matter had not been preempted by that court's dismissal of his case, he would have had something more to contribute to the record as to whether his conduct was sanctionable.    He implies that such additional contribution could show that "it [was] highly likely that [he] had no intent to cause [Czymmek] to expend $93,775.77 in attorneys' fees and costs" in connection with the Connecticut state court matters.    *See* Def.'s Resp. 23.[17]    The upshot seems to be that, because Fenstermaker lacked the opportunity to investigate what happened to his father's assets and potentially to amass evidence to support his suspicions that Czymmek engaged in misconduct as to those assets and the procedure in settling the estate, he should not be stuck with the Connecticut state court's determinations of factual and legal issues related to his purpose in choosing to litigate against Czymmek.    That is, he seems to

---

[16]  Under 28 U.S.C. § 1257, the United States Supreme Court has exclusive federal "jurisdiction over appeals from final state-court judgments."    Lance v. Dennis, 546 U.S. 459, 463 (2006) (per curiam) (citing D.C. Ct. of Appeals v. Feldman, 460 U.S. 462, 482 (1983); Atl. Coast Line R. Co. v. Locomotive Eng'rs, 398 U.S. 281, 286 (1970); Rooker v. Fidelity Trust Co., 263 U.S. 413, 416 (1923)); *see also* id. at 460, 464, 466 (emphasizing that this Rooker-Feldman doctrine is narrow—preventing state court losers from effectively seeking appellate review in lower federal courts—and is distinct from preclusion doctrines invoked by 28 U.S.C. § 1738); Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 283-84, 293 (2005) (same).

[17]  Notably, the phrasing of this implicit denial is as to a specific amount of funds but not a broader denial of any intent to cause Czymmek to spend money unnecessarily.

be suggesting that, if only he were to have an opportunity to complete that discovery, he could establish some other (but unspecified) actual purpose.

Although resulting in a digression from the issue preclusion analysis, a synopsis of Fenstermaker's efforts to suggest a purpose may be useful in dispelling his argument about discovery.    In opposing summary judgment here, Fenstermaker seems only to hint at having had some other purpose for litigating against Czymmek in the past.    He alludes to theories about Czymmek's conduct that do not reasonably lead to the inferences that he seemingly invites one to make.    Fenstermaker insinuates that Czymmek engaged in a nefarious scheme that avoided oversight when administering up to $1.5 million of assets that had been owned by their father (and perhaps somehow bankers with a general power of attorney from the father were also implicated before the father's death).    Fenstermaker emphasizes that Czymmek chose an ex parte process for settling their father's estate in Connecticut state court.    He also emphasizes that the process was one intended for, as he puts it, estates that are "insolvent."    Finally, he emphasizes that Czymmek "inexplicably spent over $93,000" responding to Fenstermaker's litigation in Connecticut state court, which he characterizes as Czymmek "defending the Insolvent Estate, which [Czymmek] had sworn was insolvent."

Thus, implicitly, Fenstermaker invites one to infer (1) that Czymmek lied about or illegitimately manufactured the estate's insolvency in order to use a process meant to deprive Fenstermaker of notice in time to challenge his disinheritance and stop her from misappropriating assets and (2) that, when confronted with litigation later, Czymmek spent a suspiciously large amount to prevent Fenstermaker from finding and exposing the truth about the estate's solvency.    For many reasons, such inferences would be unsound.    For one, the relevant Connecticut statute addressed "small estates" (valued at $40,000 or less)—not "insolvent"

21

ones—and excluded from the estate's value "property that passes outside of probate by operation of law," Conn. Gen. Stat. § 45a-273(a).   As referenced in attachments to Fenstermaker's own filings in this adversary proceeding, his father used estate planning devices that could effectuate passing property outside of probate, including through life insurance policies and trusts.   The Connecticut statute also permitted completing the estate settlement process "without notice and hearing" in certain circumstances.   Conn. Gen. Stat. § 45a-273(c).   And Fenstermaker was unsuccessful in his effort to establish that the circumstances had warranted notice to him, despite his efforts to appeal the matter all the way to the United States Supreme Court.

Moreover, even if Fenstermaker were allowed to engage in discovery and then gained sufficient credible evidence to show that Czymmek had misappropriated assets or deliberately misused an ex parte procedure—even if her goal could be established as preventing Fenstermaker from challenging his disinheritance—that evidence would not tend to help Fenstermaker in his current predicament.   Merely showing that Czymmek sought to deprive him of the opportunity to challenge his disinheritance would not change the circumstances that led to the sanction: Fenstermaker began litigation by attempting to probate a 1997 will with full knowledge of the evidence in favor of the 2016 will and no apparent ability to counter that evidence—that is, no apparent ability to counter his disinheritance.

Having noted the above deficiencies in Fenstermaker's discovery-related ideas, the Court returns to its consideration of issue preclusion.   In limited circumstances, exceptions to issue preclusion can apply when a party who would otherwise be precluded from relitigating an issue had previously lacked the opportunity or incentive to litigate that issue.   *See* Cumberland Farms, Inc., 808 A.2d at 1118 (recognizing that opportunity and incentive to litigate issues may differ between first and second forum and can thus affect whether exception to issue preclusion

should apply); *see also* Restatement (Second) of Judgments § 28(5)(c) (providing exception to issue preclusion when "[t]here is a clear and convincing need for a new determination of the issue . . . because the party sought to be precluded, as a result of the conduct of his adversary or other special circumstances, did not have an adequate opportunity or incentive to obtain a full and fair adjudication in the initial action"); id. § 28 cmts. g & j (elaborating on and stressing rarity of finding "special circumstances" contemplated in § 28(5)).

The summary judgment record here establishes, without the slightest question, that such exceptions are inapplicable to Fenstermaker.   He does not (and cannot) contend that, before he was sanctioned, he lacked the opportunity to tell the Connecticut state court what he knew and what his purpose was when he acted.[18]   Fenstermaker may have been prevented from engaging in discovery in the underlying matter, but he offers no reason why he could not have sought, in connection with defending himself in the sanction proceedings, to redress any resulting prejudicial insufficiency-of-the-evidence problem.   Fenstermaker also does not (and cannot) contend that, when facing a substantial financial sanction for his conduct, he lacked the incentive to raise all issues and to seek to present all evidence necessary to demonstrate what his purpose was in litigating against Czymmek.

Moreover, in multiple ways, Fenstermaker's logic is flawed.   Everything that a court could consider in determining Fenstermaker's purpose was fixed at the moment that he acted. Each time he chose to litigate against Czymmek, he did so with the information at hand in that

---

[18]   In its sanction decision, the Connecticut state court observed that although Fenstermaker "presented several arguments in opposition" to being sanctioned, he "did not respond to the fundamental issues of colorability and bad faith."   CT Sanction Decision at 6.   The court also rejected Fenstermaker's assertions of good faith because those assertions failed to address Fenstermaker's subjective intent, which was the requisite focus of the bad-faith analysis.   Id. (citing Lederle v. Spivey, 213 A.3d 481, 487 (Conn. 2019)).

moment.    If Fenstermaker acted only on hunches and suspicions, his being able (or not being

able) to prove later that his notions were correct would not change the fact that he decided to act

without first being able to show any likelihood of obtaining support for his claims.

Fenstermaker cannot shore up his own credibility about his purpose at the relevant time by

gaining knowledge about someone else's conduct that he did not have when deciding to act.    By

acting when he did, he risked that he was acting on far too little information to be able to

demonstrate credibility when asserting any good-faith purpose later—particularly in light of

weighty evidence, of which he was aware, against his position.    The sanctions stemmed from

taking such risks—not from a determination about whether claims could ever be proven.

As noted, the Connecticut state court sanctioned Fenstermaker for bringing and

maintaining litigation against Czymmek when he knew that he lacked factual and legal support

for the litigation—and, more precisely and formidably, knew that he lacked credible evidence to

counter the decisive evidence showing the invalidity of the 1997 will and the validity of the 2016

will.    What Fenstermaker knew, when he chose to act as he did, is what mattered to the

Connecticut state court in drawing inferences about what his purpose was at those exact

moments in time and, in turn, in deciding whether the conduct was sanctionable.    This Court's

nondischargeability analysis, detailed below, likewise must focus on Fenstermaker's knowledge,

conduct, and purpose when he chose to litigate against Czymmek.    As indicated, nothing that

Fenstermaker lacks but could theoretically obtain as evidence against Czymmek now (or could

have obtained through discovery back then) would change what he knew and did at the relevant

time.    Thus, Fenstermaker cannot show that the prior lack of opportunity for discovery causes

any unfairness that would warrant relitigation of the issues that the Connecticut state court determined about his purpose.[19]

Finally, another exception to issue preclusion that Fenstermaker invokes relates to his appeal of the Connecticut state court sanction.    He suggests that the Connecticut Appellate Court should have done more to notify him about deficiencies in his appeal before dismissing it. More specifically, he suggests that the court's method of notice to him, via only its proprietary electronic mailbox system, was insufficient to meet "due process" requirements.    Fenstermaker indicates that he had anticipated notice by other means that were not used.    He thus contends that he "was denied notice" of the impending dismissal and the dismissal itself, which "effectively denied his right to an appeal[.]"    Def.'s Resp. 20-21.

An exception to issue preclusion might apply if Fenstermaker "could not, as a matter of law, have obtained review of the [Connecticut state court sanction award.]"    *See* Restatement (Second) of Judgments § 28(1); *see also* id. § 28(1) cmt. a (providing example circumstances that may qualify such as when "controversy has become moot" and when "law does not allow review of the particular category of judgments"); Comm'r of Motor Vehicles v. DeMilo & Co., 659 A.2d 148, 156-57 (Conn. 1995) (adopting § 28(1)'s view when certain circumstances leading to mootness prevented appellate review); Water Pollution Control Auth. of Town of Stonington v. Keeney, 662 A.2d 124, 128 (Conn. 1995) (recognizing applicability of § 28(1) when lack of aggrievement would have, due to statutory limitation, prevented review of administrative action).    Fenstermaker did not, however, face such a situation.    He had a legal

---

[19]  Fenstermaker also contends that a public policy exception to issue preclusion should apply here based on his prior lack of opportunity to complete discovery.    *See* Def.'s Resp. 22-24.    The argument, however, is not cogent.    Fenstermaker does not explain how a public policy is implicated, and he melds the argument into a section seeking a review of the amount of the Connecticut state court sanction award, a task this Court cannot perform.

avenue for obtaining review of the sanction and has not argued otherwise.    The exception to

issue preclusion applies when no such avenue exists—not when a reviewing court has exercised

discretion to close the avenue for a particular appellant.    *See* <u>Town of Monroe v. Renz</u>, 698

A.2d 328, 330 (Conn. App. 1997) (citing <u>DeMilo</u>, 659 A.2d at 156-57 & Restatement (Second)

of Judgments § 28(1) cmt. a).    Fenstermaker's appeal was dismissed due to his failure to

comply with appellate procedure.    That discretionary dismissal does not qualify him as a

litigant who was unable to obtain review as a matter of law.    Therefore, that exception to issue

preclusion does not apply here.    Fenstermaker's claims about perceived inadequacies in the

appellate process in the Connecticut state court are not within the purview of this Court to decide

and do not affect this Court's analysis.

Having determined that issue preclusion applies here without exception, the Court

proceeds next to the section 523(a)(6) analysis.    This Court is, by far, not the first to tackle a

situation like this one—specifically, assessing whether a trial is unnecessary because litigation-

based sanction decisions against a debtor already satisfy each element for nondischargeability

under section 523(a)(6).    Not every litigation-based sanction can meet those required

elements—generally depending on the legal standard supporting the sanction and the details (or

lack thereof) of the debtor's knowledge, conduct, and purpose.    *E.g.*, <u>Burris v. Burris (In re</u>

<u>Burris)</u>, 598 B.R. 315, 335-37 (Bankr. W.D. Okla. 2019) (collecting cases); <u>Trenwick Am.</u>

<u>Reins. Corp. v. Swasey (In re Swasey)</u>, 488 B.R. 22, 41-43 (Bankr. D. Mass. 2013) (same).

Here, however, all elements are comfortably accounted for.

### B.        <u>Section 523(a)(6) Nondischargeability</u>

As indicated, Czymmek is relying principally on the sanction awards to prove, by a

preponderance of the evidence, that Fenstermaker's debts to her are "for willful and malicious

injury"—and thus nondischargeable here.    *See* 11 U.S.C. § 523(a)(6) (excepting generally from individual's discharge "any debt . . . for willful and malicious injury by the debtor to another [person]"); <u>Grogan v. Garner</u>, 498 U.S. 279, 291 (1991) (concluding that preponderance-of-the-evidence standard applies in nondischargeability actions under § 523(a)).

Debts "for willful and malicious injuries" have been excepted from discharge since the late 1800s.    But the terminology has remained undefined in bankruptcy statutes.    Courts have thus sought guidance from other sources that capture comparable concepts.    Although shifting over time, those sources have often reflected what is now the modern concept of intentional torts—a concept that has since been encapsulated and explicated in iterations of the Restatement of Torts, on which courts have come to rely.    *See* <u>Simões v. Sivieri (In re Sivieri)</u>, 657 B.R. 303, 308 (B.A.P. 1st Cir. 2024) (highlighting historical context of § 523(a)(6) and recognizing "substantial overlap between the 'willful and malicious injury' phrase, as interpreted, and more modern views on civil liability for intended consequences, as offered in the Restatement").

Some courts have tended to treat the modifiers of "injury"—i.e., "willful and malicious"—as two separate requirements rather than a unitary concept.    This Court follows that tradition below but notes that such treatment has, in the long run, led to converging (and to transferring of elements between) legal standards for the two requirements, as will be more evident when reaching the discussion of a "malicious" injury near the end.

### 1.        <u>Willful Injury</u>

In short, a willful injury is equated with a voluntary act that causes injurious consequences intentionally (i.e., not merely negligently or recklessly).    *See* <u>Kawaauhau v. Geiger</u>, 523 U.S. 57, 61-62, 64 (1998).    The components are further explored below.

*Voluntary Acts and Injurious Consequences*

Leading to each sanction award, Fenstermaker's acts were largely the same sort. Through court filings and the like, he pursued litigation against Czymmek.   In Connecticut state court, he filed his application to probate the 1997 will in Probate Court followed by his complaint in Superior Court followed by his multiple appeals.   In New York, he removed Czymmek's enforcement proceeding from state court to federal court and sought permanent injunctive relief.   In Maine, he objected to Czymmek's enforcement proceeding.   There is no dispute that he took these actions.   Further, in no circumstance would it be reasonable to infer from the record here that he was compelled or obligated to take such actions, including in the context of the enforcement proceedings.   Fenstermaker's acts leading to each sanction were strictly voluntary, and his choice to take such actions was a key component in each sanction award.   Those same acts are the voluntary acts here for purposes of section 523(a)(6).

Before further considering Fenstermaker's voluntary acts and their consequences, an understanding of "injury" will be helpful.   Each sanctioning court inferred that Fenstermaker had acted with knowledge that his litigation was unfounded.   That additional factor of knowledge played a significant role in each sanctioning court's determination that sanctions were warranted.   That factor is also how consequences of Fenstermaker's voluntary acts qualify as an injury here for purposes of section 523(a)(6).

Not all consequences of voluntary acts qualify as injuries—even when the consequences are harmful.   "The term 'injury,' while not defined in the [Bankruptcy] Code, is understood to mean a 'violation of another's legal right, for which the law provides a remedy.'"   First Weber Grp., Inc. v. Horsfall, 738 F.3d 767, 774 (7th Cir. 2013) (quoting portion of first definition of "injury" in Black's Law Dictionary); *see also* Restatement (Second) of Torts § 7 & cmt. a (using

"injury" "to denote the invasion of any legally protected interest of another" and distinguishing that term from "harm," which is used "to denote the existence of loss or detriment in fact of any kind to a person resulting from any cause"); <u>Geiger v. Kawaauhau (In re Geiger)</u>, 113 F.3d 848, 852 (8th Cir. 1997) (en banc), *aff'd sub nom.*, <u>Kawaauhau v. Geiger</u>, 523 U.S. 57 (indicating that Restatement (Second) of Torts § 7's "injury" definition applies to § 523(a)(6)).[20]

One consequence of Fenstermaker's voluntary acts was that Czymmek retained counsel to protect her interests in matters that Fenstermaker sought to litigate.    Prompting another to retain counsel and thus incur expense to address litigation might be financially harmful but is not inherently injurious.    In the United States, typically each party is expected to pay its own legal fees, regardless of which party prevails.    *See* <u>Alyeska Pipeline Serv. Co. v. Wilderness Soc'y</u>, 421 U.S. 240, 247 (1975); *see also* <u>Marsh, Day & Calhoun v. Solomon</u>, 529 A.2d 702, 709 (Conn. 1987) (acknowledging that this "American Rule" applies in Connecticut and, generally, nationwide); <u>Cimenian v. Lumb</u>, 951 A.2d 817, 820 (Me. 2008) (acknowledging applicability of "American Rule" in Maine).    That is, in general under the "American Rule," one does not have a legal right to be free from the expense of litigation.    Certain exceptions exist, however.

Some of those exceptions are intended to be deterrents.    Under statutes, rules, and the common law, courts have options for sanctioning a party that pursues unfounded or obstructive litigation.    Among those options are financial sanctions, which can help to indemnify a party who has incurred legal fees in addressing such litigation.    That is, the legal fees are effectively foisted on the party that pursued the unfounded or obstructive litigation.    *E.g.*, <u>Chambers v.</u>

---

[20]  Although any definitional uncertainty as to "injury" in section 523(a)(6) need not be resolved here, this Court has previously observed that courts, in section 523(a)(6) decisions, often use "injury" and "harm" interchangeably without regard to the distinctions made in the Restatement.    <u>Albert v. Nason (In re Nason)</u>, 654 B.R. 644, 648 n.3 (Bankr. D. Me. 2023).

NASCO, Inc., 501 U.S. 32, 43-51, 53-54 (1991) (discussing federal courts' inherent and other authority to sanction bad-faith conduct in litigation through punitive fee shifting); Martin v. Franklin Cap. Corp., 546 U.S. 132, 136-41 (2005) (establishing standard for fee shifting under 28 U.S.C. § 1447(c) for improper removal from state court to federal court); Lederle v. Spivey, 213 A.3d 481, 487-89 (Conn. 2019) (detailing Connecticut's bad faith exception to "American Rule"); Cimenian, 951 A.2d at 820 (detailing Maine's bad faith exception to "American Rule").

Such exceptions to the "American Rule" implicitly recognize a legally protected interest in being free from the expense of such unnecessary litigation.    More broadly, such exceptions (and other potential sanctions such as restricting a litigant's future court filings) recognize a more comprehensive legally protected interest in being free from the burdens of unfounded and obstructive litigation.[21]    It was this legally protected interest of Czymmek's that Fenstermaker invaded repeatedly.

As set forth in facts essential to the determinations of each sanctioning court, detailed above, Fenstermaker voluntarily litigated against Czymmek while knowing that his claims were unfounded.    His initial act of applying to probate the 1997 will—an act that was knowingly taken and wholly unfounded—served as the catalyst for all his later acts in the litigation, and he advanced substantially similar positions multiple times despite knowing that he lacked a supportable basis for his initial act and for the acts that followed.    Fenstermaker's actions of

---

[21]  Similar legally protected interests have also long been recognized in tort law, including in each edition of the Restatement of Torts.   *E.g.*, Restatement (Third) of Torts: Liab. for Econ. Harm § 24 & cmt. a (detailing elements of wrongful use of civil proceedings); Restatement (Second) of Torts §§ 674 (setting forth general principle of liability for wrongful use of civil proceedings), 679 (setting forth narrower principle of liability for harm caused by repetitive wrongful civil proceedings), 681 (outlining recoverable damages for wrongful civil proceedings, including reasonable expenses of defending in such proceedings); Restatement (First) of Torts §§ 674, 679, 681 (presenting same principles as those later captured in same sections of second edition).

knowingly pursuing unfounded and obstructive (and to some extent repetitious) litigation injured

Czymmek by subjecting her to the burdens of such unnecessary litigation—that is, by invading

her legally protected interests in being free from those burdens.

*Intent*

So far, essential facts determined by each sanctioning court show that Fenstermaker's

voluntary acts caused injury to Czymmek.    The next step in the section 523(a)(6) "willful"

analysis entails considering whether Fenstermaker intended for his acts to cause the above injury.

If Fenstermaker's voluntary acts were merely reckless in causing that injury to

Czymmek, then a willful injury cannot be shown.    *See* Geiger, 523 U.S. at 61-62, 64.    That is,

if Fenstermaker only failed to appreciate or exhibited indifference to the substantial risk that his

pursuit of unfounded and obstructive litigation would subject Czymmek to the burdens of

unnecessary litigation, then the requisite willfulness for section 523(a)(6) would not be shown.

*Cf.* Restatement (Second) of Torts § 500 & cmts. a-g (discussing recklessness in context of

physical safety and contrasting recklessness with lesser culpability standard for negligence and

contrasting recklessness with higher culpability standard for intentional misconduct—with the

latter setting itself apart by requiring that the actor intend not only the act but also the resulting

harm); Restatement (Third) of Torts: Phys. & Emo. Harm § 2 & cmt. a (offering similar

superseding commentary about and defining "recklessness").

If, however, Fenstermaker pursued the litigation against Czymmek with the purpose of

causing the injury (or knowing that the injury was substantially certain to result), then he

willfully caused that injury. *See* In re Slosberg, 225 B.R. at 17-19 (citing Restatement (Second)

of Torts § 8A & cmt. b); *see also* Geiger, 523 U.S. at 60, 61-62, 63 (citing Restatement (Second)

of Torts § 8A cmt. a); *cf.* Restatement (Third) of Torts: Phys. & Emo. Harm § 1 & cmt. a

(restating "intent" definition in manner comparable to definition in Restatement (Second) of Torts § 8A)).    Fenstermaker's purpose can be inferred from circumstantial or indirect evidence. *See* In re Swasey, 488 B.R. at 34-41.    As discussed below, each sanctioning court necessarily completed an analysis that suffices here.

In deciding whether to sanction Fenstermaker, each sanctioning court applied a standard that required the court to determine what Fenstermaker's purpose was when he chose to litigate against Czymmek.    The state courts each applied a bad faith standard under the common law. The federal court applied a statutory fee-shifting standard that, as interpreted, addresses frivolous (and other similarly improper) removals of cases from state court.

For its bad-faith analysis, the Connecticut state court focused on Fenstermaker's subjective intent, which the court inferred from Fenstermaker's conduct in beginning and continuing the litigation against Czymmek and from Fenstermaker's knowledge when engaging in that conduct.    CT Sanction Decision at 6-8 (citing Lederle, 213 A.3d at 487-89).    As detailed above, the combined facts led the court to infer that Fenstermaker knew that he had had no reasonable basis to apply to probate his father's 1997 will.    And, because he chose to do so anyway and to seek multiple levels of appellate review, the court further inferred "that his purpose . . . was to harass [Czymmek] and to cause her to incur expense in defending against [his] allegations."    CT Sanction Decision at 15.[22]

For its fee-shifting analysis, the New York federal court focused on Fenstermaker's basis for removing the enforcement proceeding from state court to federal court.    Czymmek Aff. Ex.

---

[22]  Working toward its conclusion about Fenstermaker's purpose, the Connecticut state court first observed that, given the facts known to Fenstermaker, no reasonable person could have believed that Fenstermaker could prevail.    The court then inferred, accordingly, that Fenstermaker himself did not believe that he could prevail.    *See* CT Sanction Decision at 14-15.

2 (hereinafter "NY Sanction Decision") at 7-8 (citing <u>Martin</u>, 546 U.S. at 137-41).    As detailed

above, the New York federal court conveyed that Fenstermaker had removed the enforcement

proceeding—a type of case that is quintessentially ineligible for removal—only to recycle failed

state-court arguments in a blatantly impermissible effort to have the Connecticut sanction award

overruled by a court that lacked jurisdiction to do that.    Given the frivolousness of the removal

and the context of Fenstermaker's prior conduct that had led to the sanction award in

Connecticut, the New York federal court inferred that Fenstermaker's purpose was to cause

Czymmek to spend more on legal fees, unnecessarily, while he deliberately delayed her

collection effort.[23]

Finally, for its bad-faith analysis, the Maine state court discerned Fenstermaker's purpose

by reviewing his knowledge and conduct there in the context of his broader knowledge and

conduct in the other two sanctioning courts and those courts' conclusions about his litigation

purposes.    As detailed above, the Maine state court relayed that, in "voluminous filings[,]"

Fenstermaker baselessly sought to stay the enforcement proceeding, re-urged frivolous

arguments from Connecticut state court (as he had done in New York federal court), and raised a

novel, unsupported, and unsupportable Eighth Amendment argument.    <i>See</i> Czymmek Aff. Ex. 3

(hereinafter "ME Sanction Decision") at 4-6.    Primarily based on his prior sanctions and status

---

[23]  Although a removing party's subjective intent might not always be a necessary component in a court's
fee-shifting analysis under 28 U.S.C. § 1447(c), it was necessary here.    As that statute has been
interpreted, the shifting of fees as a sanction for improper removal is generally reserved for circumstances
in which the removing party had no "objectively reasonable basis for [the] removal."    <i>See</i> <u>Martin</u>, 546
U.S. at 136-41.    That is, a court's decision about whether to shift fees as a sanction for improper removal
generally "turn[s] on the reasonableness of the [basis for the] removal"—thus, first requiring a
determination of what that basis was.    <i>See</i> <u>id.</u>    As to Fenstermaker, the New York federal court
concluded that he had no colorable legal basis for the removal.    Having ruled out any legal justification
for removal, the New York court assumed—quite properly—that Fenstermaker had the subjective intent
to achieve some other purpose, namely the impermissible purpose of causing delay and adding expense
unnecessarily.    <i>See</i> NY Sanction Decision at 7-8.

as an attorney, the Maine state court inferred that Fenstermaker knew that his arguments were frivolous and that he was prohibited from pursuing such arguments and from gratuitously delaying Czymmek's enforcement proceeding.   Because he nevertheless chose to act as he did, the court inferred that he had acted "contumacious[ly]" and that his only purpose was to delay Czymmek in proceeding with debt collection.   ME Sanction Decision at 6-7 (citing Lincoln v. Burbank, 147 A.3d 1165, 1179 (Me. 2016)).[24]

As noted, each sanctioning court necessarily made determinations related to and about Fenstermaker's purpose in the context of his knowledge and conduct.   Those determinations lead to only one reasonable inference here: Fenstermaker wanted to injure Czymmek precisely as he did.   Beginning with applying to probate the 1997 will, Fenstermaker repeatedly pursued litigation that he knew to be unfounded and obstructive because he wanted to harm Czymmek by causing her to endure the harassment, the expense, and then the delay of his unnecessary litigation.   As noted above, Czymmek had a legally protected interest in being free from such harm.   *Some* self-represented litigants *might* be unaware of this type of legally protected

---

[24]  Acting under its common-law inherent authority to sanction bad-faith conduct, the Maine state court enhanced its ruling by referencing certain rule-based sanctions as well.   In discussing a rule-based standard for determining whether a litigant has made a "frivolous" argument, the court noted that a finding of fault is needed—with a minimum finding that the litigant was "culpably careless" in violating the rule against making frivolous arguments.   ME Sanction Decision at 6.   From the balance of the court's decision, it is apparent that the court found Fenstermaker's conduct to be well beyond culpably careless in every respect.   The court concluded that Fenstermaker had acted in a knowingly prohibited manner for a knowingly prohibited purpose.   This conclusion is evident, among other ways, from the court's descriptors for Fenstermaker's conduct—"bad faith" and "contumacious"—which reflect a conscious and concerted effort to achieve a purpose.

interest.[25]    It would be unreasonable, however, to infer that Fenstermaker fit that description.

And he has made no such argument.

Given his experience as a licensed and practicing attorney before he pursued litigation

against Czymmek, the only reasonable inference here is that Fenstermaker knew that he could

face negative legal consequences for deliberately burdening Czymmek with unfounded or

obstructive litigation and, accordingly, that Fenstermaker thus knew that Czymmek had a legally

protected interest in being free from burdens of such unnecessary litigation.[26]    Each time

Fenstermaker set out to and then did invade that interest by pursuing his litigation, he injured

Czymmek.    This deliberate causation of injury satisfies the willfulness component of section

523(a)(6).

### 2.    Malicious Injury

The Court must next consider whether the injury was also malicious.    For section

523(a)(6) purposes, a malicious injury comes from "'a wrongful act'" that the debtor did

---

[25]  That is, they might be able to show—even while sensing the potential for harm caused by deliberately
burdening another with unfounded or obstructive litigation—that they were unaware that such conduct
was prohibited under the law.    Put another way, although realizing that their conduct could be harmful
(and dishonest), they were unaware that the conduct had been deemed to be so unacceptable by society
that legal protections and remedies against it exist.    Thus, while they might have intentionally harmed
the other, they did not intentionally *injure* the other, as required for nondischargeability under section
523(a)(6).    Seemingly, such a self-represented litigant would be rare at best, as the facts required for a
favorable inference about that litigant's subjective intent would be exceptional.

[26]  Nothing in the sanctioning courts' decisions suggests anything to the contrary.    The Connecticut state
court, as the first sanctioning court, would have been the only remotely plausible place for Fenstermaker
to raise a partial defense along the lines of ignorance or mistake of law in relation to the sanctionable
conduct (assuming that such a defense could ever be viable).    That court did not mention any effort by
Fenstermaker to defend on such a ground.    If there was such an effort, it failed.    Moreover, in its
decision, the court detailed not only the frivolous and bad-faith litigation standards but also a related
ethical rule, which Fenstermaker had been duty-bound to adhere to through his oath as a New York
licensed attorney, prohibiting him from knowingly pursuing unfounded litigation.    After that decision,
raising an ignorance or mistake of law defense in a later sanctioning court would have been preposterous,
and, again, there is no indication that Fenstermaker ever attempted to defend on such a ground.

"'without just cause or excuse.'"   In re Slosberg, 225 B.R. at 19-22 (quoting Tinker v. Colwell,

193 U.S. 473, 485-86 (1904)); *see also* id. (assessing extent to which previous interpretations of

"malicious" remained viable after Supreme Court's Geiger decision clarified "willful" to

embody intent type discussed above); Gomes v. Limieux (In re Limieux), 306 B.R. 433, 439-40

(Bankr. D. Mass. 2004) (same); *cf.* Malicious Act, Black's Law Dictionary (12th ed. 2024) ("An

intentional, wrongful act done willfully or intentionally against another without legal justification

or excuse.").

That Fenstermaker's acts at issue were wrongful has fundamentally been covered already

through the injury component discussed above.   When society provides legal protection against

an act, society is expressing that the act is wrongful.   *See, e.g.*, Wrongful, Black's Law

Dictionary (defining term as "[c]haracterized by unfairness or injustice" and "[c]ontrary to law;

unlawful").[27]   One's invasion of another's legally protected interest—i.e., one's "injury" of

another, as that term is understood here—is thus an inherently wrongful act.   Given the

expansive scope of acts that seemingly qualify as wrongful, some courts and commentators have

indicated that a minimum degree of wrongfulness should be required before a debt is declared

nondischargeable under section 523(a)(6).   *E.g.*, Jonathon S. Byington, Debtor Malice, 79 OHIO

ST. L.J. 1023, 1026-27, 1032-39, 1053-55 (2018) (collecting cases and comparing approaches

involving varying degrees of wrongfulness).   Any suggested minimum has been well-met with

the type of conduct at issue here.

Although there are sharp practices that may taint litigation, a litigant's conduct crosses

the line to being forbidden as unethical (for lawyers) and wrongful (for anyone) when

---

[27]  Black's Law Dictionary further defines "wrongful act" as "[a]n act that harms another in the absence
of any privilege or justification" and also incorporates a definition for "wrongful conduct" as "[a]n act
taken in violation of a legal duty; an act that unjustly infringes on another's rights."

deliberately pursuing litigation without a reasonable basis for doing so.    The prohibition against such conduct is not new.    The community standard on this topic has long been reflected in statutes, procedural rules, professional conduct rules, and tort law, along with the caselaw interpreting these standards and also invoking the common law.

Such conduct is prohibited precisely because it can be so harmful.    Not only does such conduct waste the limited public resources of courts, it also needlessly burdens others financially and personally, as the sanctioning courts determined that Fenstermaker deliberately did with the bad-faith, harassing, delay-driven, unfounded litigation against Czymmek recounted above. And as to whether there was any "just cause or excuse," Fenstermaker apparently offered nothing that persuasively justified his conduct.    If he had done so, the courts would not have concluded—at least not as completely and confidently as they did from the facts—that Fenstermaker's conduct was driven by an improper purpose and thus sanctionable.    The issues necessarily determined by the sanctioning courts easily establish the malicious element of section 523(a)(6) here.

### 3.        <u>**Any Debt**</u>

Above, the Court has concluded that Fenstermaker willfully and maliciously injured Czymmek.    As indicated, "any debt" that flows from such injury is nondischargeable.    *See* 11 U.S.C. § 523(a)(6); <u>Albert v. Nason (In re Nason)</u>, 654 B.R. 644, 650 (Bankr. D. Me. 2023) (citing <u>Cohen v. de la Cruz</u>, 523 U.S. 213, 218-21 (1998) & <u>Dean v. Clavet (In re Dean)</u>, 628 B.R. 851, 857-58 (Bankr. D. Me. 2021)).    That debt includes (but may not be limited to) the amount of each sanction award.

In opposing summary judgment, Fenstermaker appears to challenge the reasonableness of the amount awarded to Czymmek by the Connecticut Superior Court.    If Fenstermaker is asking

this Court to review that amount, the Court cannot.    The amount is entitled to preclusive effect here.    This Court's role under section 523(a)(6) is to determine whether the circumstances presented warrant excepting such debt from discharge (regardless of amount), which the Court has done above.

### IV.    Conclusion

A bankruptcy is designed to provide a fresh financial start for a deserving debtor.    *See* Grogan, 498 U.S. at 286-87.    But a fresh financial start is not always written on a perfectly clean slate: bankruptcy does not provide, in every circumstance, an opportunity for the debtor to litigate questions that were determined adversely to the debtor before seeking refuge in the bankruptcy court.    This adversary proceeding presents one of the instances in which the debtor is saddled with determinations made by courts before he arrived in bankruptcy.    As a result of those determinations, no trial is needed here, and Czymmek is entitled to judgment as a matter of law on all three counts.    The Court will grant summary judgment accordingly.

Dated: September 29, 2025

_____
Michael A. Fagone
United States Bankruptcy Judge
District of Maine